T.C. Memo. 1998-62


UNITED STATES TAX COURT


LEO M. RYAN, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  790-95, 3073-95,      Filed February 12, 1998.
             3117-95, 3292-95,
             3341-95.


Leo M. Ryan, pro se in docket No. 790-05.

<u>Michael A. Mulroney</u> and <u>Marcus Schoenfeld</u>, for petitioner

Ronald V. Giongo in docket No. 3073-95.[2]

---

[1]    The following cases are consolidated herewith for purposes
of trial and opinion:  Ronald V. Giongo, docket No. 3073-95; John
R. Wilson, docket No. 3117-95; James G. Cattalo, docket No. 3292-
95; and David A. Grove, docket No. 3341-95.

[2]    Also specially recognized as counsel for petitioner Giongo
are the following students at Villanova Law School Tax Clinic,
Philadelphia, Pennsylvania:  Edward Bernatavicius, Gregory Doran,
Patricia Meise, Greg Platt, Rhon C. Reid, Anthony Scardino, Jode
Shaw, Lisa Sher, Gary Sica, and Rachel M. White.

Christopher S. Wilson, for petitioner John R. Wilson in docket No. 3117-95.

James G. Cattalo, pro se in docket No. 3292-95.

David A. Grove, pro se in docket No. 3341-95.

Keith L. Gorman, George D. Curran, and Linda A. Love, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:[3]  Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes as follows:

Petitioner Leo M. Ryan (Ryan), docket No. 790-95

| Year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1982 | $44,993 | $22,497 | [1] | $11,248 |
| 1983 | 81,653 | 40,827 | [1] | 20,413 |

[1] Plus 50 percent of the interest due on the deficiency.

Petitioner Ronald V. Giongo (Giongo), docket No. 3073-95

| Year | Deficiency | Additions to Tax | | |
|---|---|---|---|---|
| | | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1982 | $45,764 | $22,882 | [1] | $11,441 |
| 1983 | 56,567 | 28,284 | [1] | 14,142 |

[1] Plus 50 percent of the interest due on the deficiency.

---

[3]     These consolidated cases were tried by the late Judge Edna G. Parker and reassigned to Judge Thomas B. Wells with the consent of the parties for disposition on the existing record.

Petitioner John R. Wilson (Wilson), docket No. 3117-95

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1) | 6653(b)(2) | 6661 |
| 1982 | $46,574 | $23,287 | [1] | $11,644 |
| 1983 | 59,924 | 29,962 | [1] | 14,981 |

[1] Plus 50 percent of the interest due on the deficiency.

Petitioner James G. Cattalo (Cattalo), docket No. 3292-95

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1) | 6653(b)(2) | 6661 |
| 1982 | $44,969 | $22,485 | [1] | $11,242 |
| 1983 | 77,862 | 38,931 | [1] | 19,466 |

[1] Plus 50 percent of the interest due on the deficiency.

Petitioner David A. Grove (Grove), docket No. 3341-95

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(b)(1) | 6653(b)(2) | 6661 |
| 1982 | $48,302 | $24,151 | [1] | $12,076 |
| 1983 | 85,674 | 42,837 | [1] | 21,419 |

[1] Plus 50 percent of the interest due on the deficiency.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The following issues are to be decided with respect to Giongo, Wilson, Cattalo, and Grove:[4]

---

[4] Ryan and respondent have entered into a stipulation of

(continued...)

(1) Whether the respective petitioners failed to report income from illegally received money or property in the taxable years 1982 and 1983;[5]

(2) whether the respective petitioners are liable for additions to tax for fraud under section 6653(b)(1) and (2) for the years 1982 and 1983;[6] and

(3) whether the respective petitioners are liable for the addition to tax under section 6661 for 1982 and 1983.

### FINDINGS OF FACT

Some of the facts have been stipulated pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant cases. At the time their respective petitions were filed in the instant cases, all petitioners resided in Pennsylvania.

---

[4](...continued)
settlement in which Ryan has conceded the issues presented in his notice of deficiency, with the provision that the amounts of unreported income are to be adjusted on the basis of this Court's opinion as to the amounts of income received by the other petitioners. Such an adjustment is necessary because of respondent's protective position asserting that certain items of income should be attributed to more than one petitioner.

[5]    Each petitioner's liability for self-employment tax will be a computational adjustment dependent on the outcome of this issue. Petitioners do not argue against the application to them of the self-employment tax per se, but that they did not receive the underlying unreported income.

[6]    Resolution of this issue will determine whether the period of limitations under sec. 6501 has expired.

During 1982 and 1983, the years in issue, petitioners were Philadelphia police officers assigned to the 5 Squad. The Philadelphia Police Department was organized on a squad system which included four line squads usually consisting of uniformed officers (called 1 Squad, 2 Squad, etc.), the 5 Squad, and a 6 Squad. The 5 Squad was a narcotics squad within the Philadelphia Police Department which had authority to enforce the ordinances of the City of Philadelphia and the laws of the Commonwealth of Pennsylvania. It also assisted in enforcement in surrounding townships by assisting police from those townships. The 5 Squad's headquarters were located at 39th Street and Lancaster Avenue in Philadelphia (the unit). The Philadelphia Police Narcotics Unit headquarters were located in the Police Administration Building (PAB) at 8th and Race Streets. The 5 Squad was disbanded on or about February 1, 1984.

5 Squad Procedures

If a police officer observed a drug transaction, that officer could make an immediate arrest and confiscate the drugs. Otherwise, an officer wishing to make an arrest could do so through the use of a search warrant or through the undercover purchase of illegal drugs. The officer preparing the search warrant was the "assigned officer" for that case.[7]

---

[7] Supervisors did not prepare search warrants.

For the undercover purchase of illegal drugs, one option was termed "letting the money walk", where the undercover police officer would make the purchase, leave the premises, complete a property receipt for the supposed drugs, and after analysis of the substance, if positive, later arrest the seller with a warrant. The officers would not recover the money used to purchase the drugs as the arrest was not immediate. By letting the money walk and establishing a relationship with that dealer, it might be possible to apprehend individuals higher up in the drug organization. For larger purchases where the authority to let the money walk was not available, a "buy-bust" could be used. Once the dealer produced the drugs, the officer would arrest the dealer and recover the purchase money.

According to departmental procedure, Philadelphia police officers prepared investigation reports for any drug searches or purchases they conducted. The assigned officer was responsible for completing the investigation report. Additionally, arrest reports were prepared for persons arrested, and property seizure reports were prepared for items seized from suspects. Seized items were taken to the evidence room, except that suspected drugs were sent to the police chemical lab, where an analysis reflecting the weights and types of drugs seized would be

performed.[8]  The weights of the drugs stated on these reports were the officers' estimates.  Paperwork would be reviewed and signed by two supervisors.  A copy of each of these reports was required to be maintained at the Philadelphia Police Narcotics Unit headquarters.

5 Squad Personnel

Ryan and Cattalo were partners in 5 Squad for most of their time on the squad and had been partners in 2 Squad prior to their being transferred to 5 Squad during 1980 and 1979, respectively. Grove joined 5 Squad during September or October of 1982 and became the partner of Charles Hund (Hund) when Hund was assigned to 5 Squad later during 1982.

Giongo became a sergeant during December 1980, and at that time, was transferred to 5 Squad to serve as supervisor.  Wilson had the rank of lieutenant and was also a supervisor.  Both Giongo and Wilson signed the investigation reports prepared by Ryan, Cattalo, Grove, and Hund.

Giongo's job as a supervisor on 5 Squad included preparing daily attendance reports, giving assignments, going on searches, and signing investigation reports.  Giongo never made buys, worked with informants, or prepared warrants.  On searches, he helped to secure the area, reducing the officers' chances of

---

[8]    An analysis reflecting drug purity was not performed unless requested.

injury.  Giongo generally would stay in the central area of the search location until a uniformed officer arrived to watch the suspects and then would check on the other officers.  Depending on the number of searches being conducted, a supervisor was not always present on each search.

Giongo reviewed the officers' warrants before they went to the magistrate to see if there appeared to be probable cause for the proposed search.  Giongo checked the reports for completeness, especially of data used for statistical purposes such as dates, times, property receipt numbers, and types of crimes.  Giongo did not verify the facts contained in warrants or other reports or check seized items against the items as listed unless such items were physically present in the unit.  Giongo signed investigation reports whether or not he had been present on the day of the search.

Giongo was assigned to police radio detail at the PAB from June 29 until August 15, 1983, during the investigation of a shooting in which he was involved.

Illegal Activities

As will be set forth in further detail below, occasionally some 5 Squad members appropriated to their own use money, drugs, or other items they seized from the suspects.  The 5 Squad members divided the appropriated money among the officers present, their partners, and sometimes their supervisor(s);

however, not all of the persons involved received equal amounts. The officers arranged to have the appropriated drugs sold and divided the proceeds, but they did not let Giongo or Wilson, their supervisors, know about their appropriation and sale of the drugs. For certain types of drugs, such as cocaine, a cutting agent was added to the drugs turned in for evidence, so that the quantity submitted was roughly equivalent to what had been seized.[9] On the investigation reports and property receipts for searches where money and drugs were appropriated, the officers reported incorrect amounts of money and, sometimes, incorrect weights of drugs seized to correspond with the quantity they submitted.[10]

### Drug Dealers and Informants

Hund came to 5 Squad from a narcotics line squad and had participated in the appropriation and sale of drugs while on that squad. Scott Karasinski (Karasinski) became an informant for Hund while Hund was on the 1 Squad narcotics unit. In return for information, Hund gave Karasinski some of the drugs and money appropriated during searches. Hund also had Karasinski sell some of the drugs appropriated during searches.

---

[9] A cutting agent also was added to the drugs to be sold.

[10] The weights of drugs would not appear incorrect if a cutting agent had been added to compensate for the amount appropriated by the officers.

William Gerace (Gerace) worked at Gerace Jewelers, a family business started by his father. He also manufactured and sold methamphetamine. Charles Hitchens (Hitchens) supplied Gerace with P2P, the prime ingredient used in the manufacture of methamphetamine, or with methamphetamine itself. Gerace paid Hitchens in cash, gold, diamonds, or methamphetamine. Pursuant to an arrangement Gerace had with Hund, Gerace gave Hund money, drugs, or jewelry in exchange for protection, i.e., not getting arrested, or for information on police activities. In a similar arrangement that Hitchens subsequently had with Hund and Grove, Hitchens would give them money for protection or information. The other petitioners did not know about such arrangements.

### Walter Roeder 1981 Search

Walter Roeder (Roeder) sold illegal narcotics during the early 1980's, including Quaaludes, P2P, and cocaine. Roeder also operated a garage for detailing cars. He kept cash in his pockets and in the oven, cabinets, and safe located in his home.

On September 22, 1981, Cattalo obtained a search warrant for Roeder's apartment, and Cattalo, Ryan, and Thomas Taggart conducted the search. The officers found small plastic bags with white powder. Roeder then arrived home carrying a bag containing $40,000 in cash. Cattalo suggested to Roeder that the officers would turn the $40,000 over to the Internal Revenue Service (IRS). The officers also threatened to arrest both Roeder and

his fiancee, Betty. Cattalo and Roeder then reached an agreement whereby Roeder would keep $20,000, the officers would keep $20,000, and the officers would neither tell Betty about Roeder's drug dealing nor arrest either of them. Betty was told that Roeder was working undercover for the Drug Enforcement Agency and that the search was a mixup; and neither Roeder nor Betty was arrested. However, the officers switched the wrappers on the money and appropriated $30,000, instead of $20,000.

### William Gerace Search

At some point, Hund, Grove, and Wilson conducted a search of Gerace's house. Hund called and warned Gerace in advance. Wilson did not know that Hund had called Gerace. No drugs were found there. Gerace offered them $3,000, but Wilson refused the money.

### James Hampton Search

During January 1984, Hund, Grove, Ryan, and Cattalo conducted a search of the house of James Hampton. Ryan had obtained the warrant. The officers found no drugs at Hampton's house, but they confiscated number plays and arrested Hampton for illegal gambling. When Hampton would not open his safe, the officers broke into it and appropriated the money contained inside. Ryan was responsible for distributing the appropriated money.

Petitioners' Financial Information

Wilson advised 5 Squad members to buy stock and referred several officers to his broker, William Johnson, at the brokerage firm of Hopper Soliday & Co. (Hopper Soliday). Generally, the officers referred by Wilson would buy stock in the same companies that Wilson bought. The officers discussed the advantages of placing assets in the names of their children.

Petitioner Wilson

Wilson bought and sold stocks regularly. Wilson opened custodial accounts for his three children. The following accounts were held at the brokerage firm Hopper Soliday:

| Account Name | Account No. |
| --- | --- |
| John R. Wilson | 219395 |
| Lisa DiWilliams[1] | 220144 |
| J.R. Wilson c/f Jennifer Wilson | 224206 |
| John R. Wilson c/f Christopher S. Wilson | 219283 |
| John R. Wilson c/f Marc James Wilson | 219263 |

[1]Lisa DiWilliams was Wilson's fiancee when the account was opened; they married on May 16, 1982.

William Johnson dealt exclusively with Wilson on all of these accounts. The largest account in terms of dollar value was that of Wilson himself.

Wilson made the following cash transactions with Hopper Soliday:

| Date | Account | Amount | Purpose |
| --- | --- | --- | --- |
| Mar. 3, 1980 | John R. Wilson | $1,410.00 | Cash deposit |
| Sept. 10, 1980 | John R. Wilson | 18,398.65 | MCI shares |

| Feb. 18, 1981 | Lisa DiWilliams | 1,900.00 | Deposit for MCI & PECO |
|---|---|---|---|
| Dec. 28, 1983 | J.R. Wilson c/f Jennifer Wilson | 1,600.00 | PECO shares |
| Jan. 30, 1984 | John R. Wilson | 1,000.00 | Cash deposit |

All other transactions with Hopper Soliday were by check.

The $18,398.65 cash payment on September 10, 1980, was a partial payment for the purchase of 2,000 shares of MCI stock at a total cost of $22,647.86.  The cash consisted of old bills in denominations of twenties, fifties, and hundreds.  Thereafter, the MCI stock split, and on December 23, 1982, Wilson sold 2,000 of the resulting MCI shares, receiving a net amount of $78,226.

On June 30, 1982, Wilson purchased Philadelphia Electric Co. (PECO) stock for $3,000.

On or about February 9, 1984, Wilson withdrew the amount of $8,359 from the account jointly held by Wilson and his wife Lisa (Mrs. Wilson) at the Police and Fire Federal Credit Union account.  On or about February 10, 1984, Wilson made a $13,000 deposit to the brokerage house of Quick & Reilly.  That deposit consisted of nine $1,000 personal money orders from Philadelphia Savings Fund Society and one $4,000 money order from Germantown Savings Bank all dated February 10, 1984.  Wilson purchased the $4,000 money order with cash.

During the years in issue, Mrs. Wilson and Grove's wife Maryann (Mrs. Grove) worked at the Police and Fire Federal Credit Union.  During or about January of 1984, Wilson and Grove and

their wives went on a vacation to Rio de Janeiro. The trip cost approximately $900 to $1,000 per person. Wilson gave Grove cash for the Wilsons' fares.

Petitioner Giongo

On December 14, 1982, Giongo purchased 22 acres of undeveloped real property in Huntington Mills, Pennsylvania, for the purchase price of $13,650. Giongo made an initial payment of $3,650, plus $473 in closing costs, and undertook a $10,000 purchase money mortgage for the balance, with monthly payments of $155.27. The property was titled in the names of Giongo and his wife. The Giongos later located a trailer and constructed a dirt road on the property.

On November 25, 1983, Giongo purchased 30 shares of AT&T stock in the name of Ronald V. Giongo, Sr., custodian for Ronald V. Giongo, Jr., for the amount of $1,955.67 through William Johnson at Hopper Soliday.

Petitioner Cattalo

Cattalo purchased MCI stock in his son's name. By December 1981, Cattalo had purchased at least $5,000 of PECO stock in the name of James G. Cattalo, custodian for James G. Cattalo, Jr. Cattalo was the payee of a money order in the amount of $2,000 dated January 7, 1982. On January 8, 1982, Cattalo deposited $3,500 in cash into his bank account. On December 14, 1982,

Cattalo received a loan advance of $4,000 from the credit union.

On August 6, 1983, Cattalo purchased a 1983 Ford cargo van for $11,222.94. Cattalo paid $5,000.94 in cash at the time of the sale and financed the remaining $6,222. The van as purchased from the dealer was a stripped-down model, which Cattalo had customized elsewhere.

Petitioner Grove

Grove opened accounts at Hopper Soliday for himself and his wife, and for his daughters. He conducted all the transactions for these accounts. He used William Johnson as his broker, having been referred to him by Wilson.

Grove made the following stock purchases through Hopper Soliday:

| Date | Title Owner | Payment Amount/Type | Stock |
|------|-------------|---------------------|-------|
| Sept. 10, 1980 | David & Maryann Grove | $1,010.71 check | MCI |
| Nov. 22, 1982 | David & Maryann Grove | 1,001.35 check | Chronar |
| Feb. 7, 1983 | D. Grove c/f Francine Grove | 1,490.48 cash | Chronar |
| June 7, 1983 | D. Grove c/f Francine Grove | 2,123.04 cash | Contracap |
| Aug. 24, 1983 | D. Grove c/f Jordan Grove | 3,012.48 check | PECO, AT&T |

The November 22, 1982, purchase of Chronar stock in the name of David and Maryanne Grove was paid for by a check, dated November 19, 1982, written on the checking account of Alan Grove, Grove's father. On November 19, 1982, a $1,000 cash deposit was made into the checking account of Alan Grove.

On or about February 14, 1983, Grove purchased stock through the brokerage house of Quick & Reilly by paying $2,590 in cash.

On March 31, 1983, Grove purchased PECO stock for $5,000 in the name of David A. Grove, custodian for Francine M. Grove. On April 5, 1983, Mrs. Grove signed a check from their joint checking account to Quick & Reilly in the amount of $2,000. On September 19, 1983, check no. 138, made payable to AT&T, in the amount of $3,000 was written on the checking account of Alan Grove and used to purchase AT&T stock in the name of David Grove, custodian for Jordan Ann Grove.

On June 7, 1983, Grove entered into a contract to purchase a 1983 motor boat and trailer from Jack's Marine for $24,000. Grove received $9,000 for the trade-in value of his 1977 motor boat. The remaining balance, after taxes and fees, to be paid for the new boat was $15,820. Grove made the following cash payments to Jack's Marine for the new boat:

| Date | Amount |
| --- | --- |
| June 7, 1983 | $100 |
| June 13, 1983 | 4,500 |
| Oct. 10, 1983 | 8,000 |
| Dec. 19, 1983 | 1,000 |
| Jan. 4, 1984 | 1,200 |
| May 14, 1984 | 1,285 |

On August 6, 1983, Grove signed a Deposit Receipt and Agreement of Sale with United Farm Agency to purchase 29 acres in Bradford County, Pennsylvania, for $18,000. On August 8, 1983, a $1,800 cash deposit was made into the checking account of Alan Grove at East Girard Saving Bank. On the same date, check no.

134, made payable to United Farm Agency, in the amount of $1,800 was written on the checking account of Alan Grove for the required deposit on the land. The purchase of the property was never consummated, and on August 30, 1983, a check in the amount of $1,800 made payable to Grove was issued by United Farm Agency. The $1,800 check was endorsed by Grove, and on September 19, 1983, deposited along with $8,000 cash into the checking account of Alan Grove.

During September 1983, Grove and Alan Grove decided to purchase real estate located in Sullivan County, Pennsylvania (the Sullivan County property), from James Bonnano for $30,000. On September 17, 1983, check no. 137, made payable to James Bonnano, in the amount of $1,000 was written on the checking account of Alan Grove. On October 11, 1983, a cash deposit of $2,000 was made into the checking account of Alan Grove.

Prior to settlement, Grove delivered $10,000 in cash to James Bonnano in two installments of $5,000 each. The settlement sheet for the Sullivan County property reflects a contract sale price of $20,000. It also reflects that $9,945.01 was paid at settlement on October 28, 1983. The amount was paid as follows: certified check nos. 140 and 141 in the amounts of $5,000 and $3,000, respectively, written on the account of Alan Grove, and a $1,945.01 cash payment. A $10,000 mortgage was obtained from

Northern Central Bank by Grove and his wife; Grove represented the purchase price to the bank as $20,000.

Petitioner Ryan

The following cash deposits were made into the joint account of Ryan and Nancy Ryan, who was then his wife, at First Pennsylvania Bank:

| Date | Amount |
|------|--------|
| Sept. 24, 1981 | $600 |
| Sept. 29, 1981 | 5,600 |
| June 15, 1983 | 5,000 |
| June 27, 1983 | 4,550 |
| July 8, 1983 | 1,000 |

On October 25, 1983, Ryan entered into an agreement to purchase a 1984 Oldsmobile Cutlass for $18,287.32. On December 12, 1984, Ryan entered into an agreement to trade in his 1984 Oldsmobile Cutlass and purchase a 1982 Oldsmobile Firenza for $4,233.70.

Hund's Financial Information

Hund made the following purchases of stock through Hopper Soliday in the names of Charles and Patricia Hund:

| Date | Payment Amount/Type | Stock |
|------|--------------------|-------|
| Feb. 11, 1983 | $9,462.08 cash | Arlen Realty, Chronar |
| Feb. 23, 1983 | 1,233.13 cash | Chronar |
| May 12, 1983 | 1,598.47 cash | Solid State Scientific |
| June 7, 1983 | 1,456.19 cash/check | Contracap |
| June 29, 1983 | 2,534.76 cash | Royal Palm Beach Colony |

Hund used William Johnson as his broker, having been introduced to him by Wilson.

Ryan's Criminal Indictment and Convictions

During September 1981, Ryan staged a phony burglary at his house.  He then filed a false police report and a false claim with his insurer, which, in March of 1982, after Ryan obtained the assistance of an attorney, sent him a check for $14,000.

Sometime during 1985 or 1986, Ryan was interviewed by the Ethics Accountability Division (EAD) of the Philadelphia Police Department about the activities of 5 Squad with regard to possible corruption.  After discussing the interview with Wilson, Ryan took steps to sue the city for harassment in order to deter their investigation.  During early 1987, Ryan heard rumors about his wife's cooperation in an investigation.  Soon thereafter, the FBI searched his house and seized the items which Ryan had reported as stolen.

On February 10, 1987, a Federal grand jury returned an indictment against Ryan.  The grand jury indicted Ryan for one count of mail fraud and three counts of filing false tax returns under section 7206(1) for the 1981, 1982, and 1983 taxable years. The mail fraud charge arose from Ryan's obtaining the insurance money from the phony burglary at his house.  The false returns counts charged Ryan with willful and knowing omission of

substantial income derived from moneys obtained from drug dealers during 1981 through 1983 and omission of the proceeds from the false insurance claim received in 1982. The ensuing criminal case was Ryan v. United States, Criminal No. 87-52 (E.D. Pa.) (Ryan's criminal case). The trial of Ryan's criminal case was held during May 1987.

In preparation for the trial of Ryan's criminal case, some of the 5 Squad members had numerous discussions as well as a few meetings. Some of the 5 Squad members, including Ryan, Cattalo, Hund, Grove, and Wilson, among others, but not Giongo, met to review discovery material. Ryan, Cattalo, Hund, Grove, and Wilson also attended a meeting held just prior to Ryan's taking the stand.

Ryan was convicted of one count of mail fraud and three counts of filing a false tax return for the 1981 through 1983 taxable years. After his conviction, Ryan agreed to cooperate with the authorities in their investigation of 5 Squad.

Hund's Cooperation

EAD also interviewed Hund about 5 Squad's appropriation of money and drugs seized from suspects. Hund informed Wilson of the EAD interview, and Wilson suggested initiating a lawsuit to slow down the investigation. Hund talked to some lawyers about

the potential lawsuit, but did not file or join any suit. After Ryan's conviction, Hund began to cooperate in the investigation.

During about March 1988, Hund entered into a pre-indictment plea agreement wherein he agreed to plead guilty to one count of conspiracy to distribute cocaine and one count of distributing cocaine. Hund also agreed to cooperate with the U.S. Attorney's Office and to testify as requested by the U.S. Attorney's Office in exchange for immunity from further criminal prosecution.

Other Petitioners' Criminal Indictments and Convictions

On July 19, 1988, a Federal grand jury returned an indictment against petitioners other than Ryan. On September 13, 1988, a Federal grand jury returned a superseding indictment against Giongo, Wilson, Cattalo, Grove, Richard Jumper (Jumper), and Francis Hilt (Hilt). That superseding indictment charged the named defendants with varying counts including: Engaging in racketeering activity, conspiring to do so with the purpose of using their power and authority as police officers to illegally obtain money and property for personal gain; distribution and possession with intent to distribute methamphetamine and cocaine; conspiracy to obstruct justice; making false statements (i.e., perjury); and filing false tax returns under section 7206(1). Each count charging the filing of a false return alleged that the respective defendant willfully and knowingly filed a return that

"he did not believe to be true and correct * * * whereas he then and there well knew and believed that he received substantial income in addition to that [reported] which included moneys stolen or otherwise obtained from drug dealers and others." The ensuing criminal case was Wilson v. United States, Criminal No. 88-282 (E.D. Pa.) (the Wilson case). Grove, Giongo, Cattalo, and Wilson were defendants in the Wilson case.

The first trial of the Wilson case began on January 3, 1989, and ended on March 10, 1989. The jury was deadlocked after approximately 5 days of deliberations, and the judge declared a mistrial. The second trial of the Wilson case began on October 2, 1989, and the jury returned its verdict on November 14, 1989.

Jumper and Hilt were acquitted on all charges. Giongo, Wilson, Cattalo, and Grove were found guilty of engaging in a pattern of racketeering and conspiracy to do so. The individual racketeering activities underlying these convictions for which at least one petitioner was found guilty are listed below.

| Search (Other) | Guilty Petitioner(s) | Act(s) |
|---|---|---|
| 1980 Cipriani | Wilson, Cattalo | Robbery, Conspiracy |
| 1981 Mingone | Wilson<br>Cattalo | Aiding and abetting bribery<br>Bribery, conspiracy |
| Roeder | Wilson, Giongo<br>Cattalo | Aiding and abetting bribery<br>Bribery, conspiracy |
| 1982 Wolff | Grove, Cattalo | Robbery, conspiracy |

| | Guilty Petitioner(s) | Act(s) |
|---|---|---|
| Wolff (distribution of drugs) | Grove, Cattalo | Intent to distribute marijuana and cocaine, aiding and abetting |
| Hitchens (payment) | Grove<br>Cattalo | Bribery, conspiracy<br>Bribery |
| Hitchens | Grove, Cattalo, Wilson<br>Giongo | Robbery, conspiracy<br>Conspiracy |
| **1983**<br>Lees | Grove, Wilson<br>Giongo | Robbery, conspiracy<br>Conspiracy |
| Garrett (distribution of drugs) | Grove, Cattalo | Intent to distribute cocaine, aiding and abetting |
| Myles (distribution of drugs) | Grove, Cattalo | Intent to distribute cocaine, aiding and abetting |
| Kaminski | Grove, Cattalo, Wilson | Robbery, conspiracy |
| Kaminski (distribution of drugs) | Grove<br>Cattalo | Intent to distribute cocaine, aiding and abetting<br>Aiding and abetting |
| Gerace (payment) | Grove, Cattalo | Bribery, conspiracy |
| Roeder | Grove, Cattalo, Wilson<br>Giongo | Bribery, conspiracy<br>Aiding and abetting bribery |
| Pontarelli | Grove<br>Cattalo | Intent to distribute cocaine, aiding and abetting<br>Aiding and abetting |

| Search (Other) | Guilty Petitioner(s) | Act(s) |
|---|---|---|
| Carr | Grove, Cattalo<br>Wilson<br>Giongo | Robbery, aiding and abetting, conspiracy<br>Aiding and abetting<br>Aiding and abetting |
| Sims | Grove, Cattalo, Wilson | Robbery, conspiracy |

| Tesylar (distribution of drugs) | Grove, Cattalo | Intent to distribute methamphetamine, aiding and abetting |
|---|---|---|
| Gonzales (distribution of drugs) | Grove | Intent to distribute cocaine, aiding and abetting |
| Baker | Grove, Cattalo, Wilson | Robbery, conspiracy<br>Aiding and abetting, conspiracy |
| Baker (distribution of drugs) | Grove, Cattalo | Intent to distribute cocaine, aiding and abetting |
| Hitchens (payment) | Grove | Bribery, conspiracy |

1984
| Hampton | Grove, Cattalo<br>Wilson<br>Giongo | Robbery, conspiracy<br>Aiding and abetting robbery, conspiracy<br>Aiding and abetting robbery |
|---|---|---|

Grove and Cattalo were found guilty of possession with intent to distribute methamphetamine with respect to the Tesylar drugs.  Grove was found guilty of possession of cocaine with intent to distribute with respect to the Gonzales drugs.  Grove and Cattalo were found guilty of possession of cocaine with intent to distribute with respect to the Baker drugs.

On counts separate from the racketeering charges, Wilson was found guilty of three counts of making false statements with respect to his testimony at the trial of Ryan's criminal case regarding the 1981 Roeder search (that he had no knowledge of whether money was illegally obtained), the 1983 Roeder search (that the total amount of money found was $13,000 and that no safe was found), and the Carr search (that he had no knowledge of money being stolen).  Cattalo was found guilty of three counts of

making false statements with respect to his testimony at the trial of Ryan's criminal case regarding the 1981 Roeder search (that no money was illegally obtained), the 1983 Roeder search (that nothing was illegally obtained and that money found there was only $10,000), and the Carr search (that the money found totaled $13,500).

Wilson, Grove, and Cattalo were found guilty of filing false returns for the 1982 through 1984 taxable years under section 7206(1). Giongo was found guilty of the same charge for the 1983 and 1984 taxable years, but not guilty for the 1982 taxable year.

The District Court granted the Government's motion to mold the jury's forfeiture verdict and for the entry of judgment of forfeiture. United States v. Wilson, 742 F. Supp. 905 (E.D. Pa. 1989), affd. without published opinion 909 F.2d 1478 (3d Cir. 1990). As a result, Giongo, Wilson, Cattalo, and Grove were held jointly and severally liable for $180,700, the amount the jury determined the racketeering enterprise had derived from its racketeering activity. The District Court ordered petitioners and Hund to pay restitution of $5,000 to James Carr; in accordance with statutory provisions, they were held jointly and severally liable for that amount.

Federal Income Tax Returns

Petitioners each filed joint 1982 and 1983 Federal income tax returns with their respective wives. On their respective

returns, petitioners reported the following amounts of total tax:

| Petitioner | 1982 | 1983 |
|------------|--------|--------|
| Giongo | $4,360 | $3,343 |
| Wilson | 22,178 | 5,722 |
| Cattalo | 2,932 | 2,326 |
| Grove | 6,158 | 4,599 |

Wilson reported net gain from the sale of stock in the amounts of $66,633 and $3,919 for 1982 and 1983, respectively.

Respondent's Determinations

Using the specific items method, respondent determined that petitioners had additional gross receipts as follows:

| Petitioner | Taxable Year 1982 | Taxable Year 1983 |
|------------|-------------------|-------------------|
| Ryan | $94,650 | $159,650 |
| Giongo | 93,300 | 121,600 |
| Wilson | 94,650 | 126,650 |
| Cattalo | 94,650 | 167,150 |
| Grove | 95,731 | 177,150 |

Respondent granted each petitioner's spouse innocent spouse status as to the deficiencies and additions to tax. Respondent mailed the respective notices of deficiency to petitioners on December 1, 1994.

OPINION

I. Unreported Income

Burden of Proof

Petitioners argue that the notices of deficiency in the instant case are arbitrary and excessive and request that we place upon respondent the burden of proof with respect to the issue of the income tax deficiency determined against petitioners

based on unreported income.  In determining the amounts stated in the notices of deficiency, respondent took a protective position, attributing the same income to more than one petitioner.

Generally, the notice of deficiency is afforded a presumption of correctness, and the taxpayer has the burden of proof as to the amounts of the deficiencies.  Rule 142(a); Anastasato v. Commissioner, 794 F.2d 884, 886-887 (3d Cir. 1986), vacating and remanding T.C. Memo. 1985-101.  The Court of Appeals for the Third Circuit, to which an appeal of the instant cases would lie,[11] will not give effect to the presumption of correctness without some predicate evidence connecting the taxpayer to the charged activity.  Id. at 887; Gerardo v. Commissioner, 552 F.2d 549, 554 (3d Cir. 1977), affg. in part, revg. in part, and remanding T.C. Memo. 1975-341; Berkery v. Commissioner, 91 T.C. 179, 195 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989).  If the taxpayer rebuts the presumption by showing the determination is arbitrary and erroneous, the presumption disappears and the burden of going forward shifts to the Commissioner, but the Court of Appeals for the Third Circuit has held that the ultimate burden of proof or persuasion remains with the taxpayer.  Anastasato v. Commissioner, supra; Sullivan v. United States, 618 F.2d 1001, 1008 (3d Cir. 1980).  The Commissioner has the right to make

[11]    See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

inconsistent determinations to protect the public fisc, as long as none of the deficiencies has been collected and the Commissioner acknowledges only one tax liability is due. Gerardo v. Commissioner, supra at 555-556.

At trial, respondent's counsel stated respondent's intention to ask the Court to decide the amounts of income each petitioner received individually. Accordingly, on brief respondent no longer attributes the same dollar of income to more than one petitioner and asserts the following amounts as petitioners' respective unreported gross receipts:[12]

| Petitioner | 1982 | 1983 |
|------------|----------|----------|
| Giongo | $16,541 | $9,425 |
| Wilson | 16,541 | 26,275 |
| Cattalo | 25,791 | 34,825 |
| Grove | 25,833 | 48,075 |

In Gerardo v. Commissioner, supra, the taxpayer was convicted of conspiracy to operate a lottery between August 5, 1966, and February 3, 1967. The Commissioner computed a deficiency in Federal income tax based on the average daily gross receipts of the lottery operation on February 2 and 3, 1966, which were projected over the period from April 4, 1966, through

---

[12] These figures represent the totals of respondent's primary assertions as to the way income from each search was divided. Generally, respondent has asserted that each petitioner deriving income from a search received an equal amount of income. In several instances, respondent has suggested alternative ways of allocating the proceeds; e.g. fewer individuals receiving larger amounts of income. Thus, depending on what the Court decides as to each search, the total annual receipts for any one of petitioners could exceed that amount shown above.

February 3, 1967.  The taxpayer presented no evidence other than his self-serving denials of his involvement.  However, the record contained no evidence of the taxpayer's involvement in the lottery prior to August 5, 1966.  The Court of Appeals for the Third Circuit stated:

> some evidence must appear which would support an inference of the taxpayer's involvement in gambling activity during the period covered by the assessment. Without that evidentiary foundation, minimal though if [sic] may be, an assessment may not be supported even where the taxpayer is silent.  [Citation omitted.]

Id. at 554.  Accordingly, the taxpayer was held to be not liable for the portion of the deficiency attributed to the period prior to August 5, 1966.

As we review each of respondent's assertions concerning each respective search, we consider whether respondent has presented predicate evidence linking the specific petitioner to the tax-generating activity from which respondent asserts income has arisen for such petitioner.  Where there is no such predicate evidence, we attribute no income to that petitioner.  Id.  Where the record provides some evidence that a particular petitioner received income on a particular occasion, but that evidence is sparse or conflicting as to the amount of the income, we charge the respective petitioner with an amount of income based on the record as a whole.  Cannon v. Commissioner, 533 F.2d 959, 960-961 (5th Cir. 1976), affg. Ash v. Commissioner, T.C. Memo. 1974-219; Arouth v. Commissioner, T.C. Memo. 1992-679; Puppe v.

Commissioner, T.C. Memo. 1988-311; see also Walker v. Commissioner, 757 F.2d 36 (3d Cir. 1985), revg. T.C. Memo. 1983-538; Gerardo v. Commissioner, supra; Mandina v. Commissioner, T.C. Memo. 1982-34, affd. 758 F.2d 1399 (11th Cir. 1984) and affd. in part, revd. in part, and remanded sub nom. Schaffer v. Commissioner, 779 F.2d 849 (2d Cir. 1985); Barber v. Commissioner, T.C. Memo. 1980-39, affd. without published opinion 679 F.2d 896 (9th Cir. 1982).

Giongo also argues that determining as to him the same deficiencies as those determined against the other petitioners, when he had at most a small role in the conspiracy, violates his rights under the Eighth Amendment to the Constitution.[13] The imposition of liability for a Federal income tax deficiency and the additions to tax for fraud, however, has been held to be remedial and not punitive. Helvering v. Mitchell, 303 U.S. 391, 397 (1938); United States v. Alt, 83 F.3d 779, 784 (6th Cir. 1996); Thomas v. Commissioner, 62 F.3d 97 (4th Cir. 1995), affg. T.C. Memo. 1994-128; McNichols v. Commissioner, 13 F.3d 432 (1st Cir. 1993), affg. T.C. Memo. 1993-61; Ianniello v. Commissioner, 98 T.C. 165, 180 (1992). Accordingly, the Eighth Amendment does not apply in the context of this civil tax proceeding.[14]

---

[13] The Eighth Amendment provides that "Excessive bail shall not be required, nor excessive fines imposed". U.S. Const. amend. VIII.

[14] However, in keeping with the opinion of the Court of Appeals
(continued...)

Amounts of Unreported Income[15]

Throughout the instant proceedings, petitioners Giongo, Wilson, Cattalo, and Grove have maintained that they received no income from illegal activities, and they testified to that effect. We will not repeat their denials in our discussion.

Carlos Ayala Search

On or about January 15, 1982, Hilt, Jumper, Cattalo, and Ryan executed a search warrant, obtained by Hilt, for the home of Carlos Ayala. The officers seized marijuana from Ayala's home. Respondent asserts that Giongo, Wilson, and Cattalo each received $75 from the Ayala search. Ryan testified that he received some money from either Jumper or Hilt from the Ayala search, and that Cattalo told Ryan that he also received some money. Ryan believes the amounts were approximately $75 each. Jumper and Hilt deny taking any money. There was neither testimony from Ayala nor any testimony that either Wilson or Giongo received funds. We find that the evidence presented does not support a finding that Cattalo, Wilson, or Giongo received funds from the

---

[14](...continued)
for the Third Circuit, we consider whether respondent has presented predicate evidence to support the unreported income attributed to each petitioner. Walker v. Commissioner, 757 F.2d 36, 42 (3d Cir. 1985), revg. and remanding T.C. Memo. 1983-538.

[15]     In order to avoid repeating certain findings of fact concerning the various searches and other activities underlying respondent's assertion of unreported income against petitioners, we have combined those findings of fact with our opinion in the instant case.

Ayala search.  Accordingly, we attribute no unreported income to Giongo, Wilson, or Cattalo from that search.

Joseph and Pamela Rizzo Search

On or about January 26, 1982, Ryan obtained a search warrant for the home of Joseph and Pamela Rizzo; and Ryan, Cattalo, Herbert Scott (Scott), and Marie Watson (Watson) executed the search warrant.  Ryan discovered that he knew Mrs. Rizzo; she had worked for his father.  The officers found a small quantity of marijuana and some cash.  Mr. Rizzo was arrested, but Mrs. Rizzo was not.  Because of some action on Ryan's part, the case against Mr. Rizzo was discharged as Ryan had promised Mr. Rizzo.

Respondent asserts that Giongo, Wilson, and Cattalo each received one-sixth of $5,000, or $833, from the Rizzo search. Ryan testified that "he believes" that Scott made an arrangement with Mr. Rizzo whereby the officers would accept money and Mrs. Rizzo would not be arrested.  Ryan does not remember whether the total amount was $500 or $5,000.  Ryan also testified that he "believes" that he received three shares[16] from the search, one each for himself, Giongo, and Wilson; and that Scott, Watson, and Cattalo each received shares.  Scott denies negotiating with Mr. Rizzo.  There was no testimony from the Rizzos.  Ryan used the phrase "I believe" to qualify many of his answers with respect to the Rizzo search.  We find that the use of that phrase creates

---

[16]  Ryan testified that "shares" are equal portions, a "piece" is half of a share, and a "bone" about $50.

uncertainty that undermines the strength of his testimony. Also, the facts that Ryan knew Mrs. Rizzo and promised to get Mr. Rizzo's case discharged lead us to question the scenario Ryan described. Apart from Ryan's testimony in this regard, which we have discounted, respondent has presented no predicate evidence connecting Giongo, Wilson, or Cattalo to the receipt of funds from the Rizzo search. Accordingly, we attribute no unreported income from the Rizzo search to Giongo, Wilson, or Cattalo.

### James Blow, Sr. Search

On or about June 11, 1982, Watson obtained a search warrant for the home of James Blow, Sr., and Cattalo, Ryan, Watson, and Scott executed the search warrant. James Blow, Jr., had illegal drugs in a bank bag and was arrested.

Respondent asserts that Giongo, Wilson, and Cattalo each received $1,200 from the Blow search. Ryan testified that he and Cattalo each received an amount "he believes" was about $1,200 from Scott. Scott denies appropriating any money. There was no testimony from Blow, Sr., or Blow, Jr. Although Ryan was less than certain about the amount of money, his testimony establishes that he and Cattalo received some amount. We sustain respondent's assertion as to the amount of unreported income from the Blow search as to Cattalo. We find no unreported income for Wilson or Giongo from the Blow search, for respondent has presented no predicate evidence to support such a finding.

Michael Duonnolo Search

On or about September 30, 1982, Ryan obtained a search warrant for the home of Michael Duonnolo (Duonnolo). Giongo, Cattalo, Ryan, and Scott executed the search warrant. The officers found illegal pills. Ryan appropriated $1,000 from Duonnolo, telling Duonnolo not to complain about it or they would arrest his wife as well as Duonnolo himself. Ryan referred Duonnolo to a specific attorney, so Ryan would receive a kickback. That attorney called Ryan, who then falsified the location of drugs reported on the investigation report in order that Duonnolo would not be convicted. Ryan received $1,000 from the attorney.

Respondent asserts that Giongo, Wilson, and Cattalo each received $200 of the $1,000 appropriated from Duonnolo and that Cattalo received $500 of the $1,000 Ryan received from Duonnolo's attorney. Scott denies that any money was appropriated, and there was no testimony from Duonnolo. Ryan did not testify as to whether or how he shared the $1,000 he appropriated from Duonnolo. Accordingly, absent sufficient predicate evidence, we do not allocate any of such payment to the other petitioners. Ryan testified that he split the $1,000 kickback from Duonnolo's attorney with Cattalo. We do not believe that Ryan would have shared such kickback, and do not allocate any part of it to the other petitioners.

Marvin Periera Search

On or about November 2, 1982, Grove obtained a search warrant for the home of Marvin Periera (Periera). Grove, Wilson, Cattalo, and Ryan executed the search warrant. The officers found marijuana and arrested Periera.

Respondent asserts that petitioners each received $200 from the Periera search. Ryan testified that he received $200 from Grove. He did not testify as to any of the other petitioners. Ryan also testified that two days later Periera offered him money and drugs so as not to be arrested on that occasion. Periera did not testify. Based on Ryan's testimony, we find it likely Grove kept at least $200 for himself. Accordingly, we sustain respondent's assertion as to the $200 received by Grove. As there is nothing in the record to indicate that Giongo, Wilson, or Cattalo received any moneys from the Periera search, we do not sustain respondent's assertions as to them.

Ernest Durkin 1982 Search

On or about November 4, 1982, Grove, Cattalo, and Ryan assisted police officers from Bensalem Township, Pennsylvania, in obtaining and executing a search warrant for the home of Ernest Durkin (Durkin) in Bensalem.

Respondent asserts that petitioners each received $1,200 from the Durkin 1982 search. Durkin did not testify. Ryan testified that Grove distributed money to him and Cattalo and

that the amount he (Ryan) received was approximately $1,200. We sustain respondent's assertions as to the amounts of income for Cattalo and Grove from the Durkin 1982 search.

Ryan also testified that Grove said he had funds for Wilson and Giongo. There is no evidence in the record that Wilson or Giongo actually received the funds.[17] We find no unreported income was received by Giongo or Wilson from that search.

Richard Wolff Search

On December 28, 1982, Grove obtained a search warrant for the third floor apartment of Richard Wolff (Wolff); and Grove, Cattalo, Giongo, Ryan, and Hund conducted a search of the premises. This was Hund's first search on 5 Squad. The officers found two trash bags of marijuana and a quantity of cocaine. Hund put the cocaine in his pocket. Ryan appropriated a radio. Inositol, a cutting agent, also was appropriated. The officers arrested Wolff and his girlfriend. Grove and Hund took one bag of marijuana and the cocaine and gave it to Karasinski for sale. This was the first time Grove met Karasinski. Grove and Ryan signed the property receipt for the search, which falsely stated that only the following were seized: One large green trash bag containing a green weed and seeds, three large clear plastic bags

---

[17]    In addition, the record contains evidence of several instances where the officers failed to give Ryan his full share or complete information as to their earnings.

with a green weed, and one large clear plastic bag with a white powder.

Respondent asserts that Grove received $3,600 ($850 from the sale of the cocaine plus installments of $2,000 and $750 from the sale of the marijuana) and that Cattalo received $750 as a result of the Wolff search. Hund testified that he received $1,700 for the cocaine which he split with Grove, one payment for the marijuana of $4,000 which he split with Grove, and then a second payment of $3,000 which he split four ways with Grove, Ryan, and Cattalo. Ryan testified that he received $200 from Cattalo that night and about $1,000 later which he understood to be the proceeds of the sale of the drugs. With respect to this search, Cattalo and Grove were convicted on charges of robbery and possession of cocaine and marijuana with intent to distribute. We sustain respondent's assertions as to the amounts of income Cattalo and Grove received from the proceeds of the drugs appropriated during the Wolff search.

### Charles Hitchens Search

On December 30, 1982, Cattalo obtained a search warrant for Hitchens' premises and Cattalo, Wilson, Giongo, Grove, and Hund conducted a search. When Hund and Grove arrived on the scene, Hitchens had two containers, each containing $24,000 in cash. After the officers introduced themselves, Hitchens recognized at least one of them by name or by face. Hitchens already owed the

Internal Revenue Service (IRS) from a previous seizure of funds and was anxious to avoid another such incident, so he offered Hund and Grove half the money to ignore the cash.[18] They accepted one container and asked Hitchens not to mention this to the other officers who would be arriving later. Hitchens put the other container in his neighbor's trash can, from which the neighbor later retrieved it for him.

Thereafter, Cattalo arrived, then Wilson, and later Giongo. Hitchens had a box of casino chips in a kitchen cabinet and diamonds in the freezer. Approximately $16,000 in a closet was left untouched. Hitchens had $2,213 in currency on his person which was returned to him. No drugs were found on the premises. Hitchens was not arrested. After the search, Hitchens found that the majority of the casino chips and diamonds were missing.

When Grove, Hund, and Cattalo left the unit at the end of their shift, each of them appropriated a portion of the $24,000 from the container. Karasinski visited Hund after the Hitchens search and saw a large sum of money, a velvet sack of diamonds, and casino chips in $500's on the kitchen table. Hund led Karasinski to believe that the items were Hund's share of what

---

[18] It was sometime after this Dec. 30, 1982, search that Hitchens developed his relationship with Grove and Hund described supra p. 10.

was appropriated on the Hitchens search. Hund and Karasinski then went to a casino and cashed in some of the chips.

Ryan was away during the Hitchens search. When he returned, Ryan received several hundred dollars from Cattalo, who attributed the money to this search, and Ryan received one diamond. Cattalo completed the investigation report on February 18, 1983, indicating that nothing was found and nothing was taken.

Respondent asserts that Grove and Cattalo each received $8,000 of the $24,000 in cash from the Hitchens search. Cattalo was convicted of bribery and Grove of bribery and conspiracy with respect to the bribe. The total amount of the bribe was $24,000. We sustain respondent's assertions that Grove and Cattalo each received $8,000 of the cash from the Hitchens search.

Respondent also ascribes one-sixth of $65,000 in casino chips and of $6,000 in diamonds to each petitioner. The total amounts are based on Hitchens' testimony that he was missing $65,000 in chips and three-quarters of approximately 300 diamonds for which he paid $6,000 to $8,000. Grove, Cattalo, and Wilson were convicted of robbery of the diamonds and/or casino chips and conspiracy, and Giongo was convicted of conspiracy for the search.

Karasinski understood the chips he saw at Hund's house to be Hund's share. Karasinski testified that he cashed in a handful

of $500 casino chips, totaling about $5,000, but that these chips were not all that Hund had.  Hund testified that Karasinski cashed in $12,000 to $14,000 of chips which Hund received from Wilson, and that Hund divided the cash into seven shares, one each for himself, Cattalo, Grove, Ryan, Wilson, Giongo, and the Captain, and distributed the shares to the respective individuals at Giongo's New Year's Eve party, with Wilson accepting the shares for Cattalo and the Captain, neither of whom attended the party.  Giongo and his wife testified about the party and denied that any distribution of money occurred during the party.  Ryan did not testify about the New Year's Eve party at all, but testified that he was away for the Hitchens search and that he later received several hundred dollars from Cattalo attributed to the Hitchens search.

As for the diamonds, Karasinski saw a sack of diamonds at Hund's house which he understood to be Hund's share.  Hund testified that Wilson found the diamonds, and that he (Hund) later saw 13 diamonds and received two diamonds from Wilson. Ryan testified that after he returned from his vacation, he, Cattalo, Grove, and Hund each picked out one diamond.

Based on the record as a whole, it is likely that Hund kept more than his proportionate share and that Ryan received less since he was not present on the search.  Faced with conflicting testimony on the amounts of casino chips and how they or their

proceeds were divided, we attribute $14,000 to Hund and divide $51,000 equally among petitioners ($10,200 each). We allocate two diamonds, or $50,[19] each to Wilson, Cattalo, and Grove.

Raymond Brown Search

Also on December 30, 1982, Cattalo obtained a search warrant for the home of Raymond Brown (Brown), one of Hitchens' customers, and after the above-described Hitchens search, Cattalo, Wilson, Grove, and Hund executed the Brown search warrant. The officers found a small amount of drugs and arrested Brown.

Respondent asserts that $6,000 was appropriated and divided six ways (including petitioners and Hund), each petitioner receiving $1,000 from the Brown search. Brown did not testify. Hund testified that Grove found and held $6,000, but that Cattalo gave Hund $800. There was no testimony regarding the other petitioners. We sustain respondent's assertion as to the amount of the deficiency resulting from the Brown search for Cattalo only, there being no predicate evidence connecting the other petitioners to money appropriated from Brown.

Raymond Lees Search

On January 7, 1983, on the basis of information Hund received from Karasinski, Hund and Grove set up Raymond Lees

---

[19]    According to Hitchens, he paid approximately $6,000 to $8,000 for about 300 diamonds. Thus, on average, each was worth about $20 to $27.

(Lees). Karasinski paid Lees $6,050 for some cocaine,[20] but did not purchase the marijuana he had requested. Hund, Grove, Giongo, and Wilson stopped Lees while he was driving away from the sale and seized two large clear plastic bags of marijuana. The officers appropriated the $6,050 from Lees during the search and did not return it. Lees was arrested and charged for having the marijuana, but not for the cocaine sale. Hund was the assigned officer and did not mention the cocaine sale or money in the investigation report.

Respondent asserts $6,050 was appropriated and divided six ways (including petitioners and Hund), each petitioner receiving $1,008 from the Lees search. Hund testified that, after the Lees search and two subsequent searches that night, he received $800 to $1,000 from Wilson, who also handed money to Grove, Ryan, Cattalo, and Giongo. Grove and Wilson were convicted of robbery of the money obtained from the Lees search and conspiracy to steal the money, and Giongo was convicted of conspiracy. Petitioners argue that the Lees search was a buy-bust and that the purchase money was not "stolen", but there is no evidence to that effect,[21] and the convictions estop those convicted from denying the robbery occurred. Cattalo and Ryan did not

---

[20]    The officers either gave Karasinski the money used to purchase the cocaine from Lees or, more likely, reimbursed him out of the sale proceeds.

[21]    Hund did not mention the cocaine deal in his testimony or in the investigation report.

participate in the Lees search. Ryan's testimony did not address the Lees search. We do not believe Ryan or Cattalo would have received money where neither one was on the search. Accordingly, we attribute no income from the Lees search to Cattalo. We allocate $1,800 each to Hund, Wilson, and Grove and $650 to Giongo from the Lees search.

### Steven and Alan Garrett Search

On January 25, 1983, Grove and Hund conducted an undercover purchase of cocaine from Steven Garrett at Garrett's residence. After purchasing two bags of cocaine for $2,200 each, Grove and Hund identified themselves as police officers. Grove, Hund, Wilson, Cattalo, and Ryan conducted a search of the premises and arrested Steven and Alan Garrett. Grove completed the property receipts and the investigation report. Hund appropriated some cocaine during the search; he used a vial's worth in his car and later took one bag to Karasinski's, where the two of them used a large amount of it.

Respondent asserts Grove and Cattalo each received $250 from the sale of the Garrett drugs. Grove and Cattalo were convicted of possession of cocaine with intent to distribute for the Garrett drugs. Hund testified that he and Karasinski used a large portion of the appropriated cocaine, that Karasinski paid him $750 for it, and that he in turn gave $250 each to Grove, Cattalo, and Ryan. Ryan testified that he received about $1,000

weeks later.  We find that Grove and Cattalo each received $250 from the sale of the Garrett drugs.

Alan Myles Search

On February 10, 1983, Grove obtained a search warrant for the premises of Alan Myles (Myles), and Grove, Giongo, Hund, Cattalo, and Ryan conducted a search.  Myles lived in a highrise building, and Giongo remained downstairs while the other four officers conducted the search of Myles' residence.  The officers found four bags of cocaine and a quantity of cutting agent.  One of the officers added some cutting agent to the cocaine and made two more bags of cocaine.  Hund and Grove took two bags of cocaine and gave them to Karasinski for resale.

Respondent asserts that Grove and Cattalo each received $1,000 from the sale of the Myles drugs.  Both were convicted of possession of cocaine with intent to distribute for the Myles drugs.  Ryan testified that he and Cattalo received at least $1,000 from either Hund or Grove for the Myles drugs.  Hund testified that Karasinski gave him and Grove about $2,000 that they shared and then Karasinski gave them some more money later, which Grove controlled.  We sustain respondent's assertions as to the income Grove and Cattalo received from the proceeds of the Myles drugs.

Ernest Durkin 1983 Search

On or about February 11, 1983, Grove, Cattalo, Wilson, Hund, and Ryan assisted police officers from Bensalem Township in

obtaining and executing a search warrant for Durkin's home. Hund appropriated at least $2,500. Durkin filed a complaint that money was stolen. The officers involved were interviewed by police investigators in relation to this complaint and, per Wilson's instructions, denied knowledge of any missing money.

Respondent asserts that Wilson, Grove, and Cattalo along with Hund and Ryan each received a portion of the $2,000 appropriated on the Durkin search. Durkin did not testify and the complaint is not part of the record. Hund testified that he found $2,500, of which he put $500 in his sock, and that at the unit, he gave Grove the remaining $2,000 and received back approximately $400 to $500. Ryan testified that he did not know about the money being appropriated at the scene, but back at the unit he received at least $75 from Grove. There is no evidence of Wilson's or Cattalo's receiving any cash from the Durkin 1983 search. Accordingly, we attribute no income to Wilson or Cattalo. We find that Grove received $400 from the Durkin search.

### Spennato Payment

Bart Spennato (Spennato) was a massage parlor operator. Hund had been receiving bribes from Spennato since Hund was on 1 Squad. Spennato would call Hund at work to say he had money for Hund, and they would talk in code in case anyone was listening in, saying, e.g., that Spennato had "information" for Hund. Sometime during 1983, Spennato contacted Hund and asked Hund to

come to his massage parlor. When leaving the unit to go to Spennato's, he told Grove and Cattalo that he was going to meet with an informant. Spennato gave Hund $2,000 to help clear his brother, who had been arrested by 1 Squad.

Respondent asserts that of a total payment of $2,000, Grove and Cattalo each received $500. Hund testified that he went to Spennato's with Grove and Cattalo and split the money with them and Bill Young from 1 Squad. Spennato did not testify, nor did Young. Grove's testimony involved answering a phone call from Spennato and did not address going to Spennato's. Cattalo did not testify about Spennato. Hund had been receiving payoffs from Spennato since Hund was on 1 Squad. We believe it unlikely that Hund shared the Spennato payment with the others and find that Cattalo and Grove derived no income from the Spennato payment.

John Kaminski/Robert Rossi Search

On March 11, 1983, Hund, observed by Grove and Wilson, conducted an undercover purchase of 3 ounces of cocaine at the price of $6,300 from John Kaminski (Kaminski) in the parking lot of a Friendly Restaurant. Ryan and Cattalo also were present. Kaminski was arrested. Robert Rossi (Rossi), who was observed delivering a brown paper bag to Kaminski, was arrested inside the adjacent Ground Round Restaurant. A search of Rossi's apartment was conducted. Hund and Grove found money and cocaine there. They appropriated some of the cocaine and took it to Karasinski to resell. Back at the unit, Grove or Hund distributed portions

of the appropriated money to Ryan and Cattalo.  When Hund received the proceeds of the sale of the cocaine from Karasinski, he distributed them among himself, Grove, Ryan and Cattalo.

Respondent asserts that Wilson, Grove, and Cattalo each received $200 in appropriated cash, and that Grove received $1,000 and Cattalo $500 of the proceeds of the drugs from the Kaminski/Rossi search.  Wilson, Grove, and Cattalo were convicted of robbery with respect to the appropriated cash.  Grove was convicted of possession of cocaine with intent to distribute. Grove and Cattalo were convicted of aiding and abetting with respect to the drug possession.  There was no testimony from Kaminski or Rossi.  Hund testified that the cash was split but did not say how.  He testified the drug proceeds were split $1,000 each to himself and Grove and $500 each to Ryan and Cattalo.  Ryan stated the amounts he received from the cash and from the drug proceeds as each being several hundred dollars.  He also testified Cattalo had received cash the night of the search. We sustain respondent's assertions as to the Kaminski/Rossi search.

Walter Roeder 1983 Search

On June 13, 1983, Ryan obtained a search warrant for Roeder's house at 228 Shawmont Avenue.  Roeder was driving when two or three officers jumped into his car and returned with him to his house; the other officers followed in their car.  Ryan, Wilson, Cattalo, and Grove conducted a search of Roeder's

premises. Ryan stayed with Roeder in the kitchen while the other officers searched the house. Ryan found $13,000 in the oven; the $13,000 was returned to Roeder. No illegal drugs were found. The officers made Roeder open his safe which contained approximately $220,000 from the sale of P2P. Ryan, at first threatening to give all $220,000 to the IRS,[22] reached an agreement with Roeder to split the money half for Roeder, half for the officers. Roeder was not arrested. After the search, the officers called Hund and Giongo, and all of them met for dinner.

At the unit after dinner, Wilson distributed portions of the appropriated money. On the daily complaint summary, Ryan typed an incorrect street number for Roeder's address and omitted Roeder's name. Ryan completed the investigation report on July 6, 1983, using Roeder's correct address and indicated that nothing was found and nothing was taken. When Ryan's wife discovered where Ryan had hidden his share of the money, he explained that it was stolen money, and she deposited some of it into their checking account.

Respondent asserts that Wilson, Grove, and Cattalo each received $21,000 and that Giongo received $5,000 from the Roeder 1983 search. Wilson, Grove, and Cattalo were convicted of bribery and conspiracy and Giongo of aiding and abetting with

---

[22] The officers had planned for Grove to act as an IRS agent should any money be found.

respect to such search.  Wilson and Cattalo also were convicted of perjury for their testimony at the trial in Ryan's criminal case regarding the amounts of money found and for denying that money was taken.  Hund testified that he received $17,000 from Wilson and that Wilson said that he would give Giongo and the Captain $5,000 each.  Ryan testified that after returning to the unit after dinner, he received about $18,000 to $22,000 from Wilson, and that Wilson said that the two piles of money on his desk were for Giongo and "the boss".  Ryan also testified that he saw Cattalo receive money.  Neither Hund nor Ryan saw Wilson giving money to anyone else.  Ryan testified that he confirmed with Hund and Grove the amounts they received, and with Giongo that the latter received something.  Ryan did not testify as to what the amounts were.  On the basis of the evidence linking petitioners to the funds appropriated during the Roeder 1983 Search, we sustain respondent's assertions.

John Bruno/Nicholas Pontarelli Search

On June 17, 1983, Cattalo obtained a search warrant for the premises of John Bruno, and Cattalo, Ryan, Grove, and Hund conducted a search.  Hund found a small and a large bag of cocaine in Nicholas Pontarelli's (Pontarelli's) car; the small bag was returned to Pontarelli.  Hund and Grove took the large bag and gave it to Karasinski who paid them for it.  The proceeds were shared among Hund, Grove, Ryan, and Cattalo.  Cattalo completed the investigation report stating one white tablet was

confiscated from the premises; he did not mention Pontarelli in the report.

Respondent asserts that Grove received $1,000 and Cattalo $500 from the sale of drugs taken during the Bruno/Pontarelli search. Those amounts are based on Hund's testimony that he received $3,000 from Karasinski, of which he and Grove each kept $1,000 and gave Ryan and Cattalo each $500. Ryan testified that he and Cattalo each received several hundred dollars a month later. With respect to those drugs, Grove was convicted of possession of cocaine with intent to distribute and aiding and abetting, and Cattalo was convicted of aiding and abetting. We sustain respondent's assertions as to the amounts of the proceeds of the drugs appropriated during the Bruno/Pontarelli search that Grove and Cattalo received.

### James Carr Search

On July 7, 1983, Ryan obtained a search warrant for the residence of James Carr (Carr), using information supplied by Hund. The search was conducted on that date by Ryan, Grove, Hund, and Cattalo. Carr operated a variety/grocery store located about 1-1/2 blocks from his residence. Carr kept the receipts from his store in a safe on the third floor of his residence. At the time of the search, the safe contained $18,505 in cash, food stamps, and some personal items. Carr had the store receipts from the early part of the day, about $700, on his person; that money was returned to him. Carr was arrested.

The officers left Carr's house with the money bags from the safe, refusing Carr's request to count the money there. At the unit, they issued Carr a property receipt for $13,505, and appropriated $5,000 for themselves. A second property receipt, not signed by Carr, indicates that the officers confiscated one glass vial with a white powder. Both property receipts contained the typed names of Ryan and Cattalo. Upon returning home, Carr found white talcum powder sprinkled all over the bureau in his bedroom. According to the seizure analysis report, the amber vial contained 220 milligrams of a white powder which contained no detectable controlled substance; the attached metal spoon contained an insufficient quantity of material to give a positive test for controlled substances. Carr did not have an amber vial with metal spoon in his house. Charges against Carr were dropped.

Respondent asserts that $5,000 was appropriated and that each petitioner received $833 from the Carr search. Grove and Cattalo were convicted of robbery of cash on the Carr search, aiding and abetting, and conspiracy. Wilson and Giongo were convicted of aiding and abetting. Wilson and Cattalo also were convicted of perjury for their testimony denying knowledge that money was appropriated. Ryan testified that he divided the $5,000 evenly among the six police officers.[23] Hund testified

---

[23] Ryan testified about a "policy" of dividing the cash equally among the officers and supervisors. He would sometimes phrase
(continued...)

that the four officers discussed giving Wilson a share and Giongo a piece.[24]  Hund also testified that he counted the money with Cattalo and that Cattalo gave him $800 to $1,000 and that he believes he saw Grove receive a share.  Taking into account that Giongo was on police radio duty at the time of this search, we allocate $500 to Giongo and $900 each to Wilson, Cattalo, and Grove.

Hitchens Summer 1983 Payment

In July of 1983, Hund received a Dunkin' Donuts bag containing $4,500 from Hitchens.  At his house, Hund counted the money and removed $1,000 from the bag; when Grove arrived, Hund removed another $1,000 while they discussed the matter,[25] without disclosing to Grove the first $1,000.  Hund told Wilson, Ryan, and Cattalo that he found the bag with $2,500 under his car seat.  Wilson advised Hund to make an incident report and turn the bag in because it could be a setup or an attempted bribe.  On July 7, 1983, Hund turned in the remaining $2,500, reporting the same

[23](...continued)
his responses in terms of who "would have" received funds. However, his testimony and that of Hund, when properly based on actual knowledge, contradicted such a "policy", both as to the supervisors' being included and the amounts' being equal. Therefore, we give less weight to Ryan's testimony.

[24]     See supra note 16.

[25]     According to Hund, Hitchens gave him this money to pay for the repairs to his car which had been damaged in a shoot-out with someone that Hitchens knew; Grove, Wilson, Cattalo, and Ryan had helped Hund pay for the repairs; and Hund wanted to reimburse them.  However, Hund did not want to reveal to them the source of the money.

story, and an investigation ensued. The investigating inspector concluded that the proposition that the money was a set-up or a bribe could not be substantiated. The money was returned to Hund at a later point not within the years in issue. Respondent asserts Grove received $500 of the Hitchens summer 1983 payment. Hund testified that he shared the second $1,000 with Grove during their conversation, each taking half. We sustain respondent's assertion.

### Clyde Sims Search

On July 21, 1983, Cattalo obtained a search warrant for the premises of "Akeem", a.k.a. "Sam", and Cattalo, Wilson, Ryan, and Grove conducted a search. They found marijuana and $1,200, and they arrested Clyde Sims (Sims). The officers did not issue Sims a money receipt for the $1,200, and they did not return the money to him.

Respondent asserts that each petitioner received $200 from the Sims search. The total amount appropriated from Sims was $1,200. Wilson, Cattalo, and Grove were convicted of robbery and conspiracy with respect to the Sims search. Both Ryan and Hund testified that they received about $200, Ryan receiving his from Cattalo, and Hund, who had been on vacation, receiving his later from Grove, who attributed the money to the Sims, and at least one other, search. Ryan testified that Grove, Hund, Wilson, and Giongo received money, but he also testified incorrectly that Hund was on the search. We need not accept Ryan's testimony in

its entirety as to who received money when he did not distribute the cash and did not testify as to any specific amounts distributed to the others.[26] Giongo was on police radio duty during the time of the Sims search. We do not believe Giongo would have received any funds from this search. Wilson, Cattalo, and Grove were present on the search and convicted of robbery. We sustain respondent's assertions as to Wilson, Cattalo and, Grove.

### Fred Megna Search

On or about July 25, 1983, Ryan obtained search warrants for two hotel rooms in the Hilton Hotel at 10th and Packer Avenue, registered to Fred Megna (Megna) and James Travers (Travers), respectively. The information for this search came from the New Jersey State Police. Cattalo, Grove, Wilson, Ryan, and Hund executed the search warrants. Cattalo and Hund heard sports bets coming in over the telephones in the hotel rooms. One of the officers found a bag containing cash.

Respondent asserts that each petitioner received $1,667 of a total of $10,000 appropriated on the Megna search. Ryan testified that $10,000 was found and that he distributed the money, giving equal amounts to the 5 Squad members present on the search and some amount to Giongo. Hund testified that Wilson found the bag and gave him about $1,500 to $2,000 from the Megna search, that Wilson said he would take care of everyone including

---

[26] See supra note 23.

Giongo, and that Ryan and Cattalo inquired to see if Hund had received his share. Giongo was still on police radio duty. There was no testimony from either Megna or Travers. In light of the conflicting testimony,[27] we allocate $1,000 to Giongo and $1,800 each to Wilson, Cattalo, and Grove.

### Sterling Ferguson Search

On or about July 28, 1983, Cattalo obtained a search warrant for the home of Sterling Ferguson (Ferguson). Cattalo, Grove, Hund, and Ryan executed the search warrant. The officers found money and cocaine. Hund appropriated a video camera. When Ferguson returned home after his arrest, he discovered that $200, cocaine, cutting agent, a triple beam scale, a gun, and a video camera were missing.

Respondent asserts that $1,000 was taken and divided six ways, with $167 distributed to each petitioner from the Ferguson search. Ferguson testified that $200 was missing along with a video camera and other items. Ryan testified that $1,000 was appropriated and that he, Grove, and Hund received money from Cattalo and that Cattalo had portions for Wilson and Giongo. Hund testified that he found an unspecified amount of money that he gave to Cattalo to hold, and that he turned down the money offered to him by Cattalo, since he appropriated the video camera. Hund states that Wilson was to receive a piece and Giongo a bone but then amended his testimony to say that Giongo

---

[27] See supra note 23.

did not receive money from the Ferguson search. Neither Ryan or Hund testified that he saw Wilson or Giongo actually receive any cash. Wilson and Giongo were not present on the search. We find that $200 was appropriated during the Ferguson search and attribute $67 each to Grove and Cattalo. We allocate nothing to Wilson or Giongo.

### Howard and Dolores Douglas Search

On or about August 22, 1983, Hund obtained a search warrant for the home of Howard and Dolores Douglas. Grove and Hund executed the search warrant.

Respondent asserts that Grove received $700, Cattalo and Wilson each $200, and Giongo $50 from money appropriated during the Douglas search. Respondent's assertion is based on Hund's testimony that (1) he and Grove kept $600 to $700 each, and (2) he estimates he (Hund) gave the others the amounts specified above. There was no testimony from the Douglases. Ryan and Cattalo were not on the search, nor was Wilson or Giongo. Based on the record as a whole, we do not believe that Ryan, Cattalo, Wilson, or Giongo received funds from the Douglas search. We sustain respondent's assertion as to Grove.

### Jacob Tesylar et al. Search

Karasinski provided Hund with information on a pending methamphetamine "cook"[28] involving Jacob Tesylar (Tesylar) that

---

[28]    "Cooking" is the term used for manufacturing methamphetamine.

led to the Tesylar searches. Gerace was in charge of the cook but was not present during the searches. On September 14, 1983, Grove, Cattalo, Giongo, Hund, and Ryan, along with police officers from Abington Township, set up surveillance of Frank Martino's (Martino's) home in Abington, Pennsylvania. On that date, Tesylar, Ronald Bertino (Bertino), and others were arrested, and a search of Martino's house was conducted. After midnight (on September 15, 1983), Hund obtained a search warrant for Bertino's house and a search was conducted there. Grove obtained a search warrant for Tesylar's premises, which was executed.

Ryan and Grove found two grocery bags of methamphetamine in the trunk of one of the cars at Martino's house and put one bag into Grove's trunk. At Bertino's house, the officers found money, methamphetamine, and lab equipment. Hund appropriated some of the money. Some money and methamphetamine were seized and turned in as evidence. Hund and Grove appropriated a large quantity of the methamphetamine, including that from Martino's and from Bertino's, to Karasinski. Karasinski sold some of the methamphetamine and later returned the remainder to Hund.

Respondent asserts that Grove received $9,250 ($4,000 + $1,500 + $3,750) and Cattalo received $3,500 ($2,000 + $1,500) from the proceeds of the sale of the drugs from the Tesylar search. Those amounts are based on Hund's testimony that he received (1) $12,000 from Karasinski of which he and Grove

appropriated $4,000 and gave Ryan and Cattalo $2,000 each, (2) an additional $6,000 from Karasinski which he split evenly with Grove, Ryan, and Cattalo, and (3) $7,500 from Neil Horner through Charles Scanzella which he split with Grove. Gerace testified about the amounts of drugs to be manufactured and those stored. Karasinski testified that he received 50 pounds of drugs from these combined searches and that he sold some of the drugs, but he did not testify as to the amounts of the proceeds. Neither Scanzella nor Horner testified. Ryan testified that he received several thousand dollars from the sale of the drugs. Grove and Cattalo were convicted of possession of methamphetamine with intent to distribute and aiding and abetting. We find Cattalo received $3,500 and Grove $5,550 from the Tesylar search drug proceeds; i.e., the proceeds coming from Karasinski, but not including those from Scanzella.

### Daniel Gonzales Search

On October 20, 1983, Daniel Gonzales was arrested by Hund, Grove, and Giongo at the bus terminal at 17th and Market Streets. Two bags of white powder were seized. The arrest was the result of a setup initiated when Hund received information from Neil Horner. Hund or Grove cut the cocaine, submitted some as evidence, and gave the remainder to Horner. Horner gave Hund $3,000 for the cocaine he received.

Respondent asserts, on the basis of Hund's testimony, that Grove received $1,000 and Cattalo $500 of the total $3,000

received for the drugs appropriated during the Gonzales search. Grove was convicted of possession of cocaine with intent to distribute and aiding and abetting with respect to the Gonzales drugs. Ryan and Cattalo were not on the search. Ryan did not testify about receiving money from the search. We do not believe that Ryan or Cattalo received money from the sale of the drugs. We find that Grove received $1,000 from the sale of the Gonzales drugs.

### Reid Baker Search

On November 16, 1983, Reid Baker (Baker) was stopped while driving to Karasinski's store to sell Karasinski about 2 ounces of cocaine. Karasinski had provided Hund with the information to set up the stop, in which Hund, Grove, Ryan, and Cattalo participated. Baker had $1,262 on his person which was returned to him. Then the officers searched Baker's residence with Baker's written consent. Prior to the search, Baker had $2,000 in one pocket of a suit hanging in his closet and $3,000 in another pocket. During the search, the officers placed $2,000 on a table where Baker could see it. They arrested Baker.

When Baker returned to his residence from the police station, he saw the $2,000 still lying on the table; however, the other $3,000 was missing from his suit pocket. Baker did not see anyone take the money.[29] After the search, Hund and Grove took

---

[29] During the time of the search, Baker was having his house painted and the painters had keys to the house.

the cocaine to Karasinski, who cut it and sold half of the resulting amount.  Karasinski divided the proceeds with Hund and Grove.

Respondent asserts that $3,000 cash was appropriated during the Baker search and divided up equally among Hund and petitioners.  Respondent also asserts that Grove and Cattalo each received $300 from the proceeds of the sale of the drugs.  Hund testified that the only money he recalled was that on Baker's person, which was returned, but he also testified that he received $200 to $250 from Grove on the way back to the unit from dropping off the cocaine at Karasinski's and that Grove said he had portions for Ryan, Cattalo, Wilson, and Giongo.  Hund's testimony conflicted with his earlier testimony that did not include Giongo as receiving any money.  Hund's testimony is also conflicting in that Giongo and Wilson did not know about or share in drug proceeds.  Ryan testified that he later received several hundred dollars from the sale of the drugs, but he does not recall receiving any money that night.  Grove and Cattalo were convicted of robbery, conspiracy, and possession of cocaine with intent to distribute.  Wilson was convicted of aiding and abetting robbery and conspiracy.  Based on the above, we allocate $600 each to Wilson, Cattalo, and Grove of the cash appropriated from Baker.  Giongo was not present on the search.  Given the questionable nature of Hund's testimony, the record does not support an allocation to Giongo.  We sustain respondent's

assertions as to the drug proceeds received by Grove and Cattalo ($300 each).

Gerace Payment

Sometime during 1983, Hund and Grove saw Gary Long (Long) and Gerace driving in Long's car and pulled them over. Hund appropriated Gerace's gun from under the seat, and Grove grabbed Long and held a gun on him. On the basis of what Hund told him, Gerace feared Grove would kill Long and he would be blamed. Gerace offered them money to settle the matter. Grove and Hund followed Gerace and Long to the house of Gerace's mother. Gerace went into his mother's house and obtained a stack of money containing at least $5,000 which he put in a brown bag and gave to Hund.

Respondent asserts that Gerace gave Grove and Hund $5,000 during this incident and that Grove and Cattalo each received $1,500 and Ryan $500 of that amount. Grove and Cattalo were convicted of bribery and conspiracy with respect to the Gerace payment. Gerace testified that the stack of money contained either $5,000 or $10,000. Hund testified that the amount was $5,000 and that the distribution was as asserted by respondent. We sustain respondent's assertions as to the amounts of the Gerace payment that Grove and Cattalo received.

Hitchens December 1983 Payment

Sometime around Christmas 1983, Hitchens invited Hund and Grove to his house and gave each of them $5,000. After this,

during late December 1983 or early 1984, Hund notified Hitchens of a search planned for his residence. Hund instructed Hitchens to leave $5,000, supposedly for Wilson, on his dresser and to be present at the house. Wilson did not know Hitchens had been warned. Wilson, Ryan, Cattalo, Hund, and Grove searched the residence. During the search, Hund appropriated the money from the dresser.

Respondent asserts that Grove received $5,000 from Hitchens in December 1983. Grove was convicted of bribery and conspiracy for this payment. We find that Grove received the $5,000.

II. Fraud

For the years in issue, section 6653(b) imposes an addition to tax of 50 percent of the underpayment of tax if any part of the underpayment is due to fraud, plus an amount equal to 50 percent of the interest on the portion of the underpayment attributable to fraud. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 201 (3d Cir. 1971), affg. T.C. Memo. 1970-37; Cochrane v. Commissioner, 107 T.C. 18 (1996). Absent a finding of fraud, section 6501 precludes the assessment and collection of the alleged deficiencies in and additions to tax for the years in issue.

For the addition to tax under section 6653(b)(1) to apply, the Commissioner must establish (1) an underpayment of taxes for each year and (2) that some part of the underpayment is due to

fraud.  Sec. 6653(b)(1); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  For the addition to tax under section 6653(b)(2) to apply, the Commissioner must establish the specific portion of the underpayment which is attributable to fraud.  Sec. 6653(b)(2); DiLeo v. Commissioner, supra at 873.

To prove an underpayment of tax, the Commissioner cannot rely on the taxpayer's failure to satisfy his or her burden of proof as to the underlying deficiency.  Parks v. Commissioner, 94 T.C. 654, 661 (1990).  Where allegations of fraud are intertwined with unreported and indirectly reconstructed income, the Commissioner can prove an underpayment by proving a likely source of the unreported income or, where the taxpayer alleges a nontaxable source, by disproving the alleged nontaxable source. DiLeo v. Commissioner, supra at 873-874.

Wilson, Grove, and Cattalo were convicted under section 7206(1) of filing false returns for both 1982 and 1983.  Giongo was convicted of filing a false return for 1983, but not 1982. The convictions do not estop petitioners from denying that there was an underpayment of tax or that any such underpayment was due to fraud.  Considine v. United States, 227 Ct. Cl. 77, 80-81, 645 F.2d 925, 928 (1981); Wright v. Commissioner, 84 T.C. 636 (1985); Franklin v. Commissioner, T.C. Memo. 1993-184.  The convictions, however, are evidence to be considered in deciding whether respondent has proved an underpayment of tax due to fraud.

Petitioners have made no contentions or presented any evidence of omitted deductions or credits. On the basis of the evidence presented in the instant cases, we conclude that respondent has established by clear and convincing evidence an underpayment of tax for 1982 and 1983 for petitioners Wilson, Cattalo, and Grove,[30] and for 1983 for petitioner Giongo. Cf. Franklin v. Commissioner, supra. For Giongo's 1982 taxable year, we conclude that respondent did not present clear and convincing evidence of an underpayment of tax. Although, in our discussion above, we attributed income from the Hitchens search casino chips to Giongo based on the preponderance of the evidence, we do not find the evidence as to his receipt of the income from the chips to rise to the level of clear and convincing. There being no other search during 1982 for which we have attributed income to Giongo, we do not find clear and convincing evidence of an underpayment of tax by Giongo for that year.

To establish fraud, respondent must show that the taxpayer intended to evade a tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax. Cochrane v. Commissioner, supra at 28. Fraud is never presumed. Id. Because direct proof of a taxpayer's intent is rarely available, fraud may be established by circumstantial

---

[30] Additionally, petitioners Wilson, Cattalo, and Grove were convicted of at least one count of either bribery or robbery within each of the years in issue. Such crimes are likely sources of unreported income.

evidence and reasonable inferences drawn from such evidence. Estate of Mazzoni v. Commissioner, supra at 202 (citing Webb v. Commissioner, 394 F.2d 366, 380 (5th Cir. 1968), affg. T.C. Memo. 1966-81); Cochrane v. Commissioner, supra at 28.  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Bagby v. Commissioner, 102 T.C. 596, 609 (1994). Circumstances which this Court and others have considered as indicative of fraud include:  Understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealment of assets, failure to cooperate with the tax authorities, dealing in cash, engaging in illegal activity, and attempting to conceal illegal activity.  Estate of Mazzoni v. Commissioner, supra; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (citing Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601).

Wilson, Cattalo, and Grove understated their income for both 1982 and 1983.  In addition to the convictions for filing false returns, they were found guilty of robbery or bribery committed during both years in issue, and Wilson and Cattalo of perjury for their testimony regarding the 1981 and 1983 Roeder searches and the 1983 Carr search.  Cattalo and Grove were convicted of possession of drugs with intent to distribute (1982 and 1983) and did receive the proceeds of the sale of drugs.  Petitioners attempted to conceal such activities in various ways including: Filing or signing false investigation reports and property

receipts (Cattalo--1983, Grove--1982 and 1983, Wilson--1983), cutting drugs (Grove--1983), not telling supervisors of drug theft and resale (Cattalo, Grove--1982 and 1983), not revealing protection arrangements (Grove--1983), and the perjury previously mentioned (Cattalo, Wilson). Grove, in particular, made several large cash payments during 1983, for the purchase of real property and a boat. The cash paid for the real estate was "under the table".

We hold that respondent has established by clear and convincing evidence that there is an underpayment of tax due to fraud for petitioners Wilson, Cattalo, and Grove for the years 1982 and 1983. The entirety of each of their underpayments arises from their fraudulent schemes. Consequently, for Wilson, Cattalo, and Grove, the period of limitations does not apply to 1982 or 1983, and we hold that they are liable for the additions to tax under section 6653(b)(1) and (2) to the full extent of their underpayments for each year.

The badges of fraud present with respect to Giongo are his convictions for racketeering and conspiracy and for filing a false return under section 7206(1). Underlying Giongo's racketeering conviction were conspiracy, aiding and abetting bribery, and aiding and abetting robbery. Such crimes, in contrast to bribery or robbery per se, do not include the element of obtaining money or property. A conviction under section 7206(1) does not establish fraud but is one factor to be

considered.  <u>Wright v. Commissioner</u>, <u>supra</u> at 643-644.  As we have held above that respondent has not established by clear and convincing evidence an underpayment by Giongo for 1982, respondent has not proved fraud for that year, and the expiration of the period of limitations bars assessment and collection of tax for that year.  For 1983, we hold that there is clear and convincing evidence of an underpayment which, when combined with other evidence, including Giongo's convictions for racketeering and filing a false return, establishes fraud for 1983.  Accordingly, the period of limitations does not preclude assessment and collection of tax for that year, and we hold that Giongo is liable for the additions to tax under section 6653(b)(1) and (2) as to his entire underpayment for 1983.

III. <u>Additions to Tax Under Section 6661</u>

Section 6661(a) imposes an addition to tax of 25 percent of any underpayment attributable to a substantial understatement of income tax.  A substantial understatement is any understatement which exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000.  Sec. 6661(b)(1).  If the taxpayer has substantial authority for the tax treatment of the item in question, or if the taxpayer adequately discloses the tax treatment of the item on the return, then the amount of the understatement for purposes of this section will be reduced by that portion of the understatement which is attributable to that item.  Sec. 6661(b)(2)(B).

None of petitioners made any disclosures with their returns. Petitioners' only argument is that there is no deficiency, so there can be no addition under section 6661.  Should any of their respective understatements of tax as recalculated in accordance with this opinion be substantial, we hold that the respective petitioner is liable for the addition to tax under section 6661 for that year.

In keeping with the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.